**Flaminto THOMAS, Appellant,**

v.

**COMMONWEALTH OF KENTUCKY, Appellee.**

**No. 2002–SC–0021–DG.**

Supreme Court of Kentucky.

Nov. 18, 2004.

Rehearing Denied Feb. 17, 2005.

Irvin Halbleib, Jr., Louisville, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Courtney J. Hightower, Assistant Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice COOPER.

Appellant, Flaminto Thomas, and his wife, Dellithi Thomas, were convicted by a McCracken Circuit Court jury of criminal abuse in the second degree. KRS 508.110. Appellant was sentenced to three years in prison enhanced to seventeen years upon the jury's additional verdict that he was a persistent felony offender (PFO) in the first degree. KRS 532.080(3). The Court of Appeals affirmed his criminal abuse conviction but reversed the PFO verdict because the documentation of Appellant's prior felony convictions in Illinois did not contain the statutorily required judicial certification. KRS 422.040. Appellant seeks further review claiming (1) there was insufficient evidence to support his conviction of criminal abuse in the second degree; (2) the Commonwealth exercised its peremptory strikes in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); and (3) an item of real evidence introduced at trial, a green, plastic, twenty-ounce Mountain Dew soda bottle containing cocaine residue, was insufficiently identified to authorize its admission into evidence. KRE 901. Finding no error, we affirm.

## I. SUFFICIENCY OF THE EVIDENCE.

On the night of November 4–5, 1999, Dellithi Thomas was at home alone with two of her children in the rental mobile home that she shared with Appellant. The children had fallen asleep in the living room while watching a movie on television. At approximately 4:00 a.m., while Mrs. Thomas was asleep in the master bedroom, D.W., then age two, crawled into bed with her. She noticed that D.W. was extremely groggy but did not realize until approximately 6:30 a.m. that he was seriously ill. She later discovered that he had ingested five or six Valium pills that she kept in an unlocked curio box in the drawer of a dresser. When Appellant returned home, she told him what had happened. Appellant mixed milk and castor oil in a green, plastic, twenty-ounce Mountain Dew soda bottle and fed it to D.W. He then retired to the bedroom and went to sleep. At 9:00 a.m., Mrs. Thomas attempted to use the telephone in the trailer park rental office to call for help; however, the attendant had not yet arrived. Later, she sought help from her mother, Jeannie Herndon. Herndon instructed her to bring D.W. to her place of employment. When Herndon noticed that D.W. could not hold his head up, she and Mrs. Thomas transported him to the emergency room at Lourdes Hospital.

At the hospital, Mrs. Thomas initially denied knowing the cause of D.W.'s condition. Later, she told the attendant nurse that he had stuck his head into a heating vent, leading the nurse to believe that D.W. was suffering from carbon monoxide poisoning. Subsequent urine tests revealed the presence of both Valium and cocaine in his system. D.W. was extremely lethargic, could not hold his head up or talk, and at one point, almost stopped

breathing and was placed on a respirator. Ultimately, he was airlifted to Vanderbilt Hospital and treated in the pediatric intensive care unit. There was no evidence that he sustained any long-term complications from the drug ingestion although there was medical testimony that it may be too early to make that determination.

Eventually, Mrs. Thomas was arrested and Appellant left Kentucky for Chicago, Illinois. Several days later, Herndon retrieved Mrs. Thomas's belongings from the rental mobile home and stored them in her attic. While cleaning out the mobile home, she discovered an empty, green, plastic, twenty-ounce Mountain Dew bottle that contained a white residue subsequently determined to be cocaine.

KRS 508.110 states in pertinent part:

(1) A person is guilty of criminal abuse in the second degree when he wantonly abuses another person or permits another person of whom he has actual custody to be abused and thereby:

 (a) Causes serious physical injury; or

 (b) Places him in a situation that may cause him serious physical injury

 . . . .

 (c) Causes torture, cruel confinement or cruel punishment; to a person twelve (12) years of age or less, or who is physically helpless or mentally helpless.

■ On a motion for a directed verdict of acquittal, all fair and reasonable inferences are drawn in the Commonwealth's favor. *Commonwealth v. Benham*, Ky., 816 S.W.2d 186, 187 (1991). After learning that D.W. had ingested a substantial quantity of Valium, Appellant did not seek proper medical treatment but instead fed him a home remedy of milk and castor oil. Appellant asserts that the Commonwealth was precluded from advancing this theory of wanton criminal abuse because it was not specifically set forth in the indictment. This argument is unpreserved because Appellant failed to raise it at trial, RCr 9.22, and we perceive no manifest injustice, RCr 10.26, or any prejudice to Appellant. *Washington v. Commonwealth*, Ky.App., 6 S.W.3d 384, 386–87 (1999) (no prejudice where indictment charged defendant with "intentionally causing" injury, but jury instructions also permitted conviction upon a finding that defendant "attempted to cause" injury). *See also Baker v. Commonwealth*, Ky., 103 S.W.3d 90, 94 (2003) (no error where indictment but not instructions for use of a minor in a sexual performance included the word "induce," as Appellant had notice of the statutory language and the evidence supported the instruction). In fact, defense counsel addressed Appellant's defense to this theory in his closing argument: "Now the Commonwealth's going to tell you that the failure to get medical care . . . was wanton and they're guilty of second-degree criminal abuse." Counsel argued that D.W. was alert before going to the hospital and that the defendants had no way of knowing the gravity of his condition.

There is also the evidence that Appellant fed D.W. the mixture of milk and castor oil from a bottle that contained cocaine. While no witness testified that Appellant knew the bottle contained cocaine, the jury was free to infer that he did. *Commonwealth v. Sawhill*, Ky., 660 S.W.2d 3, 4 (1983) (standard of review is the same whether conviction is based on direct or circumstantial evidence). We conclude that the evidence was sufficient for a reasonable jury to believe beyond a reasonable doubt that Appellant was guilty of wanton criminal abuse. *Benham*, 816 S.W.2d at 187.

## II. BATSON ISSUE.

■ We are again confronted with the recurring tension between the use of per-

emptory challenges and the equal protection right against purposeful racial discrimination in the jury selection process. Pursuant to *Batson v. Kentucky, supra,* the defense team challenged the prosecutor's use of peremptory strikes to excuse all four African–American members of the jury panel. The prosecutor initially stated that he struck one juror because of his criminal history but could not remember why he struck the others. Upon re-examining his notes, he explained that his office was prosecuting one of the juror's sons on drug charges. He stated that he struck the other two jurors solely on the basis of their demeanor, facial expressions, and responsiveness during voir dire. Noting that this case may have been racially charged, given that Appellant is African–American, whereas his co-defendant wife and the victim, D.W., are Caucasian, Appellant claims that the Commonwealth used demeanor as a pretext for racial discrimination in excusing two of the four African–American jurors.

■ *Batson* established a three-step process for determining whether a prosecutor's peremptory challenges violate the Equal Protection Clause. First, the defendant must show a prima facie case of racial discrimination. If the trial court is satisfied with the defendant's showing, the burden shifts to the prosecutor to state race-neutral reasons for the peremptory strikes. The trial court must then determine whether the defendant has sufficiently proven purposeful discrimination. *Batson,* 476 U.S. at 93–98, 106 S.Ct. at 1722–24.

■ Because the prosecutor stated his reasons for striking the four jurors in question, there is no need to determine if a prima facie showing was made; thus, we proceed to the second step. *Commonwealth v. Snodgrass,* Ky., 831 S.W.2d 176, 179 (1992) (citing *Hernandez v. New York,*

500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (plurality opinion)). Appellant claims that demeanor is categorically inadequate as a race-neutral explanation for a peremptory strike. He is mistaken. As stated in *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam), Appellant has erroneously combined the second and third steps of the *Batson* inquiry. In *Purkett,* the United States Supreme Court rejected outright the notion that certain race-neutral explanations are always pretextual or inadequate:

> It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike carried his burden of proving purposeful discrimination. At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. But to say that a trial judge *may choose to disbelieve* a silly or superstitious reason at step three is quite different from saying that a trial judge *must terminate* the inquiry at step two when the race-neutral reason is silly or superstitious. *The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.*

*Id.* at 768, 115 S.Ct. at 1771 (emphasis added) (reversing Eighth Circuit's holding that prosecutor's statement that he did not like juror's looks was *per se* inadequate). A race-neutral reason "is not a reason that makes sense, but a reason that does not deny equal protection." *Id.* at 769, 115 S.Ct. at 1771; *McCurdy v. Montgomery County,* 240 F.3d 512, 521 (6th Cir.2001) ("This non-racial explanation need not be particularly persuasive, or even plausible, so long as it is neutral.") (internal quota-

tions and citations omitted). *See also Snodgrass,* 831 S.W.2d at 179 (trial court can accept prosecutor's reasons at face value). As demeanor is a race-neutral explanation, the Commonwealth met its burden of proof, shifting the burden back to Appellant. *United States v. Marrowbone,* 211 F.3d 452, 456 (8th Cir.2000) ("Inattentiveness and demeanor can be race-neutral reasons."); *United States v. Forbes,* 816 F.2d 1006, 1010–11 (5th Cir.1987) (prosecutor's intuitive assumption from juror's posture and demeanor that she resented being in court was race-neutral reason). *See also Stanford v. Commonwealth,* Ky., 793 S.W.2d 112, 114 (1990) (juror's flashy manner of dress, size, and perceived "slowness" were race-neutral reasons).

■ Although a prosecutor theoretically could fabricate a demeanor-based pretext for a racially-motivated peremptory strike, the third step in *Batson* alleviates this concern by permitting the court to determine whether it believes the prosecutor's reasons. *Yarborough v. State,* 947 S.W.2d 892, 896 (Tex.Crim.App.1997) (en banc) ("[S]ubjective evaluations of venire members could be used to disguise violations of the Equal Protection Clause. But this does not mean that such evaluations must always be held to have no weight. Trial judges are not without ability to detect pretexts."). Given the trial court's unique ability to evaluate the demeanor of both the jurors and the prosecutor, its ruling stands unless clearly erroneous. *Washington v. Commonwealth,* Ky., 34 S.W.3d 376, 379–80 (2000); *Stanford v. Commonwealth,* 793 S.W.2d at 114. Appellant points to nothing in the record that compels us to disturb the trial court's finding. This is not a case like *Washington* where it was clear from the record that the prosecutor offered pretexts for striking an African–American juror. In *Washington,* the prosecutor first denied striking the juror then, after it was proven that he had

used a peremptory strike against the juror, claimed he did so because of the juror's youth, even though the juror was forty-three years old. 34 S.W.3d at 379. Here, the issue turns solely on the prosecutor's credibility and the judge's opportunity to personally observe the demeanor of both the prosecutor and the jurors. As such, there is nothing in the record upon which to base a finding of clear error.

### III. IDENTIFICATION OF REAL EVIDENCE.

■ When Jeannie Herndon went to the Thomases' rented mobile home to retrieve her daughter's belongings, she found a green, plastic, twenty-ounce Mountain Dew soda bottle containing a chunky, crystalline, white residue. Because she knew that Appellant had fed D.W. a milk and castor oil mixture from such a bottle, Herndon, wearing gloves, placed the bottle in a plastic garbage bag and knotted it. She then called Detective Jerry Jones, who was investigating the case, and told him of her discovery. Jones told Herndon to keep the bottle and that he would come by her house and retrieve it. However, he failed to do so. Herndon stored the bottle in her attic with her daughter's other belongings. Six days before trial, Herndon remembered the bottle, found it in her attic still in the plastic garbage bag, and gave it to the prosecutor. A test of the residue in the bottle revealed it to be cocaine. (The bottle was not tested for the presence of milk or castor oil.)

■ Appellant contends that the Commonwealth did not introduce sufficient evidence to prove that the bottle containing the cocaine residue was the same bottle that he used to feed the mixture of milk and castor oil to D.W. or, if it was, that the cocaine was in the bottle when he so used it. Our discussion begins with KRE

901(a), governing the foundation required for the admission of tangible evidence:

> The requirement of . . . identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims.

Logically, a proper foundation requires the proponent to prove that the proffered evidence was the same evidence actually involved in the event in question and that it remains materially unchanged from the time of the event until its admission. *Beason v. Commonwealth*, Ky., 548 S.W.2d 835, 837 (1977). *See also McCormick on Evidence* § 212, at 8 (John W. Strong ed., 5th ed.1999). The necessary foundation depends upon the nature of the evidence. Evidence readily identifiable and impervious to change may be admitted based solely on testimony that it appears to be the actual object in an unchanged condition. *Beason*, 548 S.W.2d at 837. *See also Grundy v. Commonwealth*, Ky., 25 S.W.3d 76, 80 (2000) (same). However, the more fungible the evidence, the more significant its condition, or the higher its susceptibility to change, the more elaborate the foundation must be. *E.g., Rabovsky v. Commonwealth*, Ky., 973 S.W.2d 6, 8 (1998) (laboratory-tested blood sample); *Mollette v. Ky. Pers. Bd.*, Ky.App., 997 S.W.2d 492, 495 (1999); Paul C. Gianelli, *Chain of Custody and the Handling of Real Evidence*, 20 Am.Crim. L.Rev. 527, 537 (1983) ("[I]f the condition of an object, not merely its identity, is the relevant issue, a chain of custody may be required to establish that the object had not been altered. . . .").

The evidence here does not fit neatly into either category. Ordinarily, a bottle is considered to be a readily identifiable object. Edward J. Imwinkelried, *The Identification of Original Real Evidence*, 61 Mil. L.Rev. 145, 150 (1973) (common items that have qualified as readily identifiable objects have included tools, bags, *bottles*, tires, a piece of rope). Undoubtedly, millions of green, plastic, twenty-ounce Mountain Dew soda bottles have been manufactured. However, only one was found inside the Thomas residence after Appellant fed D.W. the milk and castor oil mixture from such a bottle. Thus, Appellant's primary challenge to the admission of the evidence is whether the condition of the bottle remained unchanged with respect to the presence of the cocaine. He mounts such a challenge with good reason, as the cocaine residue exponentially increases the bottle's probative value by proving the corpus delicti, *i.e.*, showing how cocaine was introduced into D.W.'s body.

Thus, the required foundation lies somewhere in the middle of the continuum, between mere testimony as to the object's identity and condition and proof of chain of custody.

> Suppose that the condition of an article is a critical issue in the case. . . . The chain-of-custody is very weak and leaves serious doubt in the judge's mind. However . . . each witness testified that he believed that the exhibit was the same object he had previously seen and that it appeared to be in the same condition . . . . Standing alone, the testimony would not support the exhibit's admission . . . . Yet the testimony is logically relevant and admissible, and the cumulative effect of the testimony and the chain-of-custody evidence might persuade the judge to admit the object.

Imwinkelried, *supra*, at 165. Such a fusion of standards is neither unusual nor unprecedented. The near universal recognition that the chain of custody need not be absolute illustrates this principle. *Rabovsky*, 973 S.W.2d at 8; *Mollette*, 997 S.W.2d at 495. The presence of the cocaine does not make the bottle, itself, more

or less readily identifiable as the one from which Appellant fed the mixture of milk and castor oil to D.W. But, its presence is what elevates that act to a criminal offense. Thus, stronger proof than mere identification is required to dispel concerns that the cocaine entered the bottle after the occurrence of the act, *i.e.,* to establish that the bottle was materially unchanged from the time of the act until the time its contents were tested.

■■■ Appellant first claims that because Herndon did not witness the event, she could not testify that the bottle she found was the one he used to feed the milk and castor oil to D.W. Were we to accept that argument, any real evidence collected by someone other than a testifying eyewitness would be excluded. *State v. Bohe,* 447 N.W.2d 277, 280 (N.D.1989) ("By strictly interpreting [Appellant's] argument, no physical evidence would be admissible unless the police officers actually witnessed the crime or event of which the physical evidence came about.... [T]here would always be a defect in the chain of custody unless the physical evidence was retrieved immediately after the commission of the crime."). We have never held that real evidence is *per se* inadmissible absent eyewitness testimony or direct evidence. In fact, our rule permitting identification of evidence by linking it to the events in question by time, place, and circumstance belies Appellant's argument. *Barth v. Commonwealth,* Ky., 80 S.W.3d 390, 402 (2001) (sticks admissible as possible weapon used to beat victim because they matched welts on his back, even though victim never saw the weapon with which he was beaten); *Grundy,* 25 S.W.3d at 79–80 (concrete found at crime scene admissible as possible weapon although victim did not see the object used to strike him in the back of his head); *Sweatt v. Commonwealth,* Ky., 550 S.W.2d 520, 523 (1977) (gun admissible even though victim who was hit on the head with it was unable to positively identify it); Comment, *Preconditions for Admission of Demonstrative Evidence,* 61 Nw. U.L.Rev. 472, 479 (1966) ("The situation may arise where there are no witnesses who can directly connect the object with the place and time of injury. One such case is where an apparently relevant object is found shortly after the time at issue and close to the place at issue. In this situation, analysis of physical facts surrounding the finding and an attempt to indicate by those facts the relative certainty of the identification become the important trial methods."). *See also State v. Shelman,* 159 N.C.App. 300, 584 S.E.2d 88, 92 (2003) (unnecessary to prove exact history of drugs before they were tested); Imwinkelried, *supra,* at 169 ("If [the courts] had addressed the question, they probably would have held that if the other evidence of similarity is sufficiently pervasive, personal testimony is unnecessary. It is the fact of similarity which renders the evidence logically relevant; and in principle, the fact of similarity admits of both direct and circumstantial proof. Direct, personal testimony of similarity is unnecessary.").

The Commonwealth sufficiently linked the bottle to the crime. Herndon found the bottle at the scene of the crime approximately five days after Appellant fed the victim from a green, plastic, twenty-ounce Mountain Dew bottle. She testified that the white residue that subsequently tested positive for cocaine was in the bottle when she found it. These facts illustrated a reasonable probability that the bottle admitted into evidence was the instrumentality by which cocaine was introduced into D.W.'s body. *Cf. Cook v. Commonwealth,* Ky., 401 S.W.2d 51, 53 (1966) (blue paint stain on a wood block allegedly thrown at a car with blue paint on its wheels linked the block to the crime).

While this evidence falls short of absolute proof of identity, our law does not require it. *See Higgins v. Commonwealth,* 142 Ky. 647, 134 S.W. 1135, 1138 (1911) ("The proof need not positively show the connection; but there must be proof rendering the inference reasonable or probable from its nearness in time and place or other circumstances."). *See also Johnston v. State,* 541 N.E.2d 514, 516 (Ind.1989) (inability to conclusively prove that items found in a bag were the same ones used in the crime not fatal to admissibility); *State v. Sneed,* 571 So.2d 735, 740 (La.Ct.App. 1990) ("lack of positive identification goes to weight of the evidence rather than admissibility"); *State v. Comeaux,* 524 So.2d 863, 865 (La.Ct.App.1988) (pieces of glass from a burglary laying outside and not collected until three months after the crime admissible even though witness could not "scientifically state" that they came from the window broken during the crime; lack of positive identification goes to weight, not admissibility); *DeLuna v. State,* 501 P.2d 1021, 1024–25 (Wyo.1972) (positive proof of identity of instrumentality of crime not required); Imwinkelried, *supra,* at 172 (identity can be proven by circumstantial evidence).

 Appellant next contends that the Commonwealth was unable to prove that the integrity of the bottle was preserved because it was unable to account for it for an extended period of time. This argument relates to the sufficiency of proof that the cocaine did not enter the bottle after he used it to feed the mixture of milk and castor oil to D.W. We initially note that the requirement of unchanged condition is "to be read in light of the principle that such evidence is admissible if the trial judge determines that there is a reasonable probability that the evidence has not been altered in any material respect since the time of the crime." *United*

*States v. Jackson,* 649 F.2d 967, 973 (3d Cir.1981) (internal quotation and citation omitted). Thus, the trial court's decision stands absent an abuse of discretion. *Id.; Grundy,* 25 S.W.3d at 80 (trial court granted wide discretion because required foundation depends on the nature of the evidence); *see also United States v. Lane,* 591 F.2d 961, 962–63 (D.C.Cir.1979) ("So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in light of the surrounding circumstances.").

 Naturally flowing from the discretionary nature of this inquiry is the principle that an unbroken chain of custody is generally unnecessary. "Chain of custody" is not an end in itself, but a term of art describing a means of proving an object's authenticity. *McCormick, supra,* § 212, at 9 ("[F]oundational requirements are essentially requirements of logic, and not rules of art."). Any gaps go to the weight, rather than the admissibility of the evidence, and the proponent need only demonstrate a reasonable probability that it has not been altered in any material respect. *McKinney v. Commonwealth,* Ky., 60 S.W.3d 499, 511 (2001); *Rabovsky,* 973 S.W.2d at 8; *Mollette,* 997 S.W.2d at 495. Thus, in line with liberal chain of custody requirements, the mere fact that evidence has been misplaced, insecurely kept, or unstored for a significant period of time is not *per se* fatal to admissibility. *Gilmore v. United States,* 742 A.2d 862, 870–72 (D.C.1999) (bottle containing bomb residue admissible although police officer had misplaced it for eight months and then found it in his locker in a paint can); *State v. Bales,* 246 Iowa 446, 68 N.W.2d 95, 96 (1995) (that evidence was not found until two months after the crime affected weight rather than admissibility); *Sneed,* 571

So.2d at 740 (evidence that was misplaced for ten years and inexplicably reappeared in sheriff's office admissible); *Comeaux*, 524 So.2d at 864–65 (three-month delay; evidence had been sitting outside at the scene of the crime); *Bohe*, 447 N.W.2d at 279–80 (one-month delay in finding tire iron after crime did not require exclusion); *Kelly v. State*, 52 Okla.Crim. 125, 3 P.2d 244 (App.1931) (evidence found on defendant's premises several months after the offense and his incarceration properly admitted). Notably, however, this is not a case where the proponent is utterly unable to account for the whereabouts of evidence over a period of time. After finding the bag containing the bottle stored in the attic of her home, Herndon was able to account for its whereabouts while it was "missing." *Gilmore*, 742 A.2d at 872.

■ That aside, the most relevant factors are the circumstances surrounding the preservation of the evidence and the likelihood of tampering by intermeddlers. *Pendland v. Commonwealth*, Ky., 463 S.W.2d 130, 133 (1971) ("All possibility of tampering does not have to be negated. It is sufficient in these cases that the actions taken to preserve the integrity of the evidence are reasonable under the circumstances."). *See also Gallego v. United States*, 276 F.2d 914, 917 (9th Cir.1960); *United States v. S.B. Penick & Co.*, 136 F.2d 413, 415 (2d Cir.1943); Imwinkelried, *supra*, at 159. Both factors weigh in favor of admission of the evidence in this case. In *Pendland, supra*, we held that storing cut marijuana plants in a plastic bag in a private garage sufficiently preserved their integrity. *Id.* at 133. Similarly, Herndon stored the bottle in a tied garbage bag in the attic of her home. *See DeLuna*, 501 P.2d at 1024 (noting that drugs in question were stored in "a private home and not a public place"). Furthermore, Appellant makes no specific claim of tampering by intermeddlers, and "speculation ... is not enough to destroy ... integrity." *Brown v. Commonwealth*, Ky., 449 S.W.2d 738, 740 (1969). *See also Pendland*, 463 S.W.2d at 133 (noting the absence of evidence of tampering). No evidence in the record suggests that Herndon tampered with the bottle or that any other individual altered it while it was stored in her home. Nor does the record indicate that intermeddlers tampered with the bottle before its recovery. There was no evidence that anyone other than Appellant and his wife had access to their residence after the incident occurred and before Herndon found the bottle. We conclude that the trial court properly exercised its discretion in admitting the bottle and the results of the test of its contents.

The dissenting opinion correctly notes that two *"Bruton* violations" apparently occurred during this trial. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). One such violation was specifically waived and the other was not preserved for review. Appellant did not raise the issue in either his brief to the Court of Appeals or his brief to this Court. The issue was not addressed at oral argument and Appellant has not requested review for palpable error. KRE 103(a)(2)(e). Since Appellant has never assigned these incidents as errors requiring reversal for a new trial, we do not *sua sponte* address them in this opinion. Assignments of error are made by appellants, not appellate courts. *United States v. Janus Indus.*, 48 F.3d 1548, 1559 (10th Cir.1995); *cf. Chism v. Commonwealth*, 286 Ky. 314, 150 S.W.2d 694, 695 (1941) (declining to search the record for unassigned error).

Accordingly, the decision of the Court of Appeals is affirmed.

LAMBERT, C.J.; GRAVES, KELLER, and WINTERSHEIMER, JJ., concur.

JOHNSTONE, J., dissents by separate opinion with STUMBO, J., joining that dissenting opinion.

Dissenting Opinion by Justice JOHNSTONE.

I respectfully dissent.

It is not an overstatement to say that the Mountain Dew bottle was critical to the Commonwealth's case against Appellant. And, as the majority opinion acknowledges, the Mountain Dew bottle in this case presented a novel issue concerning foundational requirements. However, I do not agree with the majority's conclusion that a sufficient foundation was established for introduction of the bottle. The circumstances surrounding the Mountain Dew bottle, coupled with its intensely damaging effect on Appellant's defense, warranted a stronger foundation for admission. The foundation that was established was incomplete, and relied in part on inadmissible testimony.

The most obvious problem in the foundation is that it failed to link the bottle to the Appellant. While the chain of custody satisfactorily established that the bottle taken from the Thomases' home was in essentially the same condition as the day Jeannie Herndon pulled it out of her attic, no satisfactory foundation was laid linking the bottle to the Appellant. "The Commonwealth bears the burden of identifying and tracing the chain of custody from the *defendant* to its final custodian." *Commonwealth v. Hubble*, Ky., 730 S.W.2d 532, 534 (1987) (emphasis in original). Appellant never stated that he fed the child the milk and castor oil mixture from a Mountain Dew bottle; the jury only heard Appellant state that he fed the child the mixture without identification of a certain vessel. Moreover, the Commonwealth did not test the bottle for the presence of milk or castor oil, a test that presumably could have linked the bottle to Appellant far more conclusively.

The only competent evidence tending to prove that Appellant fed the child from the Mountain Dew bottle came from the testimony of Detective Jerry Jones and Jeannie Herndon. Detective Jones testified that Appellant's wife stated, during a second interview, that Appellant fed the child the milk and castor oil mixture from a green, plastic Mountain Dew bottle. Jeannie Herndon later testified that Appellant's wife had told her that Appellant fed the child from a Mountain Dew bottle. Both of these statements should not have been admitted into evidence. Detective Jones's statement was admitted in clear violation of the rule set forth in *Bruton v. United States* prohibiting the admission of a non-testifying codefendant's confession that inculpates the defendant at a joint trial. 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Jeannie Herndon's testimony, as used to establish that Appellant used a Mountain Dew bottle to feed the child, was clearly inadmissible hearsay. Inexplicably, both Detective Jones's and Jeannie Herndon's testimonies were permitted without objection from defense counsel. Nonetheless, I believe that Appellant's substantial rights were affected by the admission of this testimony, which in turn was critical to admission of the Mountain Dew bottle, the most damaging evidence in an otherwise purely circumstantial case. I believe that reversal pursuant to RCr 10.26 is warranted.

STUMBO, J., joins this dissent.