Garnett C. PARRISH, Appellant

v.

COMMONWEALTH of Kentucky, Justice and Public Safety Cabinet, Department of Corrections, J. Michael Brown, Appointing Authority; and Kentucky Personnel Board Appellees

NO. 2013-CA-001445-MR

Court of Appeals of Kentucky.

RENDERED: JUNE 12, 2015; 10:00 A.M.

BRIEF FOR APPELLANT: William A. Carter, Crestwood, Kentucky

BRIEF FOR APPELLEES: Angela E. Cordery, Frankfort, Kentucky, Mark A. Sipek, Frankfort, Kentucky

BEFORE: DIXON, JONES AND VANMETER, JUDGES.

*OPINION*

JONES, JUDGE:

In 2010, the Kentucky Department of Corrections ("KDOC") terminated Garnett C. Parrish's employment after his urine tested positive for cocaine. Parrish appealed his termination to the Kentucky Personnel Board ("Board"). The Board determined that substantial evidence supported the KDOC's decision to terminate Parrish. Parrish appealed the Board's decision to the Franklin Circuit Court. On appeal, Parrish maintained that: (1) the Board's reliance on the drug test results was improper because the KDOC did not put forth evidence sufficient to prove an unbroken chain of custody with respect to Parrish's urine sample; and (2) the KDOC failed to prove a violation of its policies because it did not offer any evidence that cocaine is a substance capable of altering the mind or body and/or affecting the senses. After the Franklin Circuit Court rejected Parrish's arguments, he appealed to our Court. Having reviewed the record, we AFFIRM.

## I. BACKGROUND

During the relevant time period, Parrish was employed by the KDOC as the Mechanical Maintenance Operations Supervisor for Kentucky State Reformatory ("KSR"). On July 20, 2010, while on duty at KSR, Parrish lost consciousness, fell, and hit his head. After he regained consciousness, Parrish remained at work, but continued to feel ill. At some point, he told one of his superiors, Deputy Warden Pollack, that he believed he should leave work and go to the hospital. In accordance with the KDOC's policies, Pollack requested Parrish to report to the Captain's office to provide a urine sample for a drug test before he left the premises for medical care. Parrish complied and reported to the Captain's office where Lt. Darin R. Wilder collected the urine sample.

Parrish's urine sample was ultimately transported to Phamatech, Inc. laboratory, via UPS, for drug screen testing. Approximately one week later, the KDOC received the drug test results back from Phamatech. The results indicated that Parrish's urine tested positive for benzoylecgonine (metabolized cocaine). Two days later, KDOC Commissioner LaDonna Thompson placed Parrish on special leave with pay for investigative purposes; Parrish was notified that the reason for the suspension was to investigate suspicions that Parrish was under the influence of an illegal substance in the workplace.

On August 8, 2010, KSR Warden Cookie Crews notified Parrish that the KDOC intended to dismiss him from his position. Warden Crews conducted a pre-termination hearing with Parrish and his attorney on August 17, 2010. On August 31, 2010, Warden Crews issued a letter to Parrish notifying him that his employment with the KDOC would terminate at the close of business on September 1, 2010.

Warden Crews provided the following reasons for Parrish's termination:

> Misconduct, i.e., on July 20, 2010, you consented to a post accident urinalysis after falling and hitting your head. The results from the drug testing company, Pharmatech [sic], Inc., were received at the Department of Corrections, Division of Personnel, on July 27, 2010, revealing a positive test for Cocaine 100 ng/ml, with the screen cutoff being 150 ng/ml. The results of this drug screen were reported to me in the ordinary course of business by Pharmatech [sic], Inc., pursuant to its contractual obligations, and were relied upon by me in making this decision.

Warden Crews stated that Parrish's actions were a violation of the KDOC's Drug Free Workplace Employee Drug Testing Policy 3.11, the KDOC Code of Ethics, CPP [1] 3.1, and constituted misconduct pursuant to 101 KAR [2] 1:345.

Parrish appealed his dismissal to the Kentucky Personnel Board. Following an evidentiary hearing, the Hearing Officer issued Findings of Fact, Conclusions of Law, and Recommended Order on March 17, 2011, in which she concluded that the KDOC's termination of Parrish was not authorized.[3] The Hearing Officer based this conclusion on her factual finding that Parrish's urine sample was not immediately sealed in a vile. In so finding, the Hearing Officer chose to believe Parrish instead of Lt. Wilder. Because the Hearing Officer did not believe that the KDOC established an unbroken chain of custody for Parrish's urine, she chose to disregard the urine test results in considering the propriety of Parrish's termination.[4] Since the drug test results were the only evidence the KDOC produced to justify Parrish's termination, the Hearing Officer determined that her findings mandated a decision in Parrish's favor.

Alternatively, the Hearing Officer concluded that the KDOC failed to produce evidence that cocaine is a substance "which has, or may have, the effect of impairing the mind or body, or otherwise affect the senses, responses, motor function, or alter a person's perception while on duty." The Hearing Officer concluded that because the KDOC did not present some expert testimony to establish this fact, it could not prove that Parrish violated its policies.

The KDOC filed exceptions with the Board. The Board rejected a number of the Hearing Officer's recommended findings. Specifically, the Board determined that Lt. Wilder's testimony regarding the collection and storage of Parrish's urine was more credible and believable than Parrish's testimony. As a result, the Board found that the KDOC proved Parrish's "urine sample sent to the laboratory was [Parrish's] and has established the [KDOC's] chain of custody." The Board also rejected the Hearing Officer's deter-

---

1. Kentucky Corrections Policies and Procedures.

2. Kentucky Administrative Regulations.

3. We will discuss only the findings and conclusions relevant to deciding the instant appeal.

4. The Hearing Officer concluded that because there was not a clear, unbroken chain of custody the KDOC was required to produce some evidence tending to show "it improbable that the urine sample was either exchanged with another sample or contaminated or tampered with, and to show that the actions taken to preserve the integrity of the urine sample were reasonable under the circumstances." Ultimately, the Hearing Officer determined that the KDOC did not present any evidence capable of establishing such issues in its favor. As such, the Hearing Officer gave "no weight to the evidence presented by the Department in connection with the urine sample provided by Parrish."

mination that the KDOC's failure to put forth medical evidence regarding the system altering nature of cocaine was fatal. The Board concluded that it was not seriously in dispute that "cocaine is a drug that can be mind altering or otherwise affect the senses" and that it "is certainly aware that cocaine is an illicit substance and is contraband." Based on its findings, the Board concluded that the KDOC's termination of Parrish was "for just cause."

Parrish filed a petition for judicial review in the Franklin Circuit Court. After reviewing the record, the circuit court affirmed, holding that while "reasonable people may disagree about the underlying facts, the Board acted within its discretion in adopting findings of fact and conclusions of law that were supported by substantial evidence in the record, even though they deviated from the recommendation of the hearing officer."

This appeal followed.

## II. STANDARD OF REVIEW

Review of a state termination is a multi-tiered process, which begins outside the courts of justice at the administrative level with the Kentucky Personnel Board. *See* KRS [5] 13B.020. If the termination dispute cannot be resolved by agreement of the parties, a hearing officer is obligated to preside over an administrative hearing where the parties are permitted to introduce evidence and make appropriate arguments to support their positions. *See* KRS 13B.080. Generally, the hearing officer has sixty (60) days after receiving a copy of the official record to issue "a written recommended order which shall include his findings of fact, conclusion of law, and recommended disposition of the hearing, including recommended penalties, if any." KRS 13B.110(1). Each party then has "fifteen (15) days from the date the recommended order is mailed within which to file exceptions to the recommendations with the agency head." KRS 13B.110(4).

The final administrative order must be issued by the agency head, not the hearing officer. In making the final order, the agency head must consider the record, the hearing officer's findings and recommendations, and any exceptions filed by the parties. KRS 13B.120. "The agency head may accept the recommended order of the hearing officer and adopt it as the agency's final order, or it may reject or modify, in whole or in part, the recommended order, or it may remand the matter, in whole or in part, to the hearing officer for further proceedings as appropriate." KRS 13B.120(2). "If the final order differs from the recommended order, it shall include separate statements of findings of fact and conclusions of law." KRS 13B.120(3).

After the agency head issues its final order, the parties may appeal to the courts of justice "by filing a petition in the Circuit Court of venue ... within thirty (30) days after the final order of the agency is mailed or delivered by personal service." KRS 13B.140(1). On appeal, the circuit court is not to substitute its own judgment as to questions of fact, but may either affirm the final order of the agency, or reverse it, in whole or in part. KRS 13B.150(2).

A party aggrieved by the circuit court's final judgment may then appeal to the Court of Appeals. KRS 13B.160. In reviewing an agency decision, we must be ever mindful of our limited role. If the agency's decision is supported by substantial evidence, we must uphold that decision, even if there is conflicting evidence in the record and even if we might have reached a different conclusion. *500 Associates, Inc. v. Natural Res. & Envtl. Prot.*

---

**5.** Kentucky Revised Statutes.

*Cabinet,* 204 S.W.3d 121, 131 (Ky.App. 2006).

Substantial evidence does not mean that the record could not support any other conclusion. "The test of substantiality of evidence is whether when taken alone or in the light of all the evidence it has sufficient probative value to induce conviction in the minds of reasonable men." *Kentucky State Racing Comm'n v. Fuller,* 481 S.W.2d 298, 308 (Ky.1972). If there is substantial evidence in the record to support the Board's findings, they will be upheld, despite other conflicting evidence in the record. *Kentucky Comm'n on Human Rights v. Fraser,* 625 S.W.2d 852, 856 (Ky.1981); *see also* KRS 13B.150(2). We may not reinterpret or reconsider the merits of the claim, nor can we substitute our judgment for that of the agency as to the weight of the evidence. *Id.* We further note that "[i]n its role as a finder of fact, an administrative agency is afforded great latitude in its evaluation of the evidence heard and the credibility of witnesses[.]" *Aubrey v. Office of Attorney Gen.,* 994 S.W.2d 516, 519 (Ky.App.1998); *see also McManus v. Kentucky Ret. Sys.,* 124 S.W.3d 454, 458 (Ky.App.2003).

### III. ANALYSIS

#### A. Urine Test Results

Parrish's first assignment of error concerns the admissibility of the urine test results. Parrish maintains that insufficient evidence existed to establish the integrity of the urine sample. Accordingly, he believes that the Board erred in relying on the sample to conclude that the KDOC had just cause to terminate him.

"Logically, a proper foundation requires the proponent to prove that the proffered evidence was the same evidence actually involved in the event in question and that it remains materially unchanged from the time of the event until its admission." *Thomas v. Commonwealth,* 153 S.W.3d 772, 779 (Ky.2004). "[A] chain of custody is required for blood samples or other specimens taken from a human body for the purpose of analysis to show that the sample tested in the laboratory was the same sample drawn from the victim." *Mollette v. Kentucky Personnel Bd.,* 997 S.W.2d 492, 495 (Ky.App.1999).

Nevertheless, our appellate courts have been clear that admissibility does not require proof of "a perfect chain of custody or to eliminate all possibility of tampering or misidentification, so long as there is persuasive evidence that the reasonable probability is that the evidence has not been altered in any material respect." *Id.* (internal quotation omitted).

In *Mollette,* we held that a sufficient chain of custody was established for admission of the evidence where various chain of custody documents were signed and personnel testified regarding their routine procedures for handling a specimen. *Id.* at 496. We were clear that the chain of custody for admissibility purposes does not need to include eyewitness testimony recollecting every minute the specimen was handled during the testing. The fact that some personnel involved in the process cannot recall handling the specific sample at issue is not fatal. Instead, "[t]estimony as to routine practice sufficient to dispel any inference of substitution or change in the contents of the exhibit in question may be used to establish a chain of custody." *Id.*

In this case, there was testimony that Parrish provided a urine sample to Lt. Wilder, that Lt. Wilder complied with procedures in handling the sample, that Parrish signed chain of custody documents related to the sample, that the sample was

delivered to the laboratory intact, and that once at the laboratory, the sample was tested according the laboratory's general testing procedures and protocols. This evidence met the admissibility standard. *See Allen v. Kentucky Horse Racing Auth.*, 136 S.W.3d 54, 60 (Ky.App.2004).

The alleged gaps in custody Parrish points out do not render the urine test results inadmissible. Rather, they "go to the weight of the evidence rather than to its admissibility." *Mollette*, 997 S.W.2d at 495. In considering what weight to place on the urine sample, the Hearing Officer concluded that Parrish's version of the events was more credible than Lt. Wilder's version. However, the hearing officer is not the final fact-finder in administrative proceedings. *See* KRS 13B.120. The Board acted well within its statutory authority when it decided to reject the Hearing Officer's conclusions. The Board reviewed the record and determined that Lt. Wilder's testimony was more credible than Parrish's testimony. The Board justified its conclusion with detailed findings. Having reviewed the record, we agree with the Franklin Circuit Court that the Board's findings in this regard are supported by substantial evidence.

### B. Evidence Concerning Cocaine

■ Lastly, Parrish claims that there is not sufficient evidence in the record to prove that cocaine is a mind-altering drug as described in the Kentucky Correctional Policies. Accordingly, he does not believe that the KDOC proved that it had just cause to terminate him for violating its policies.

The KDOC's policy CPP 3.11 provides that "an employee shall not ... report to work under the influence of alcohol or other substance or substances." The policy defines being "under the influence" to include an employee whose "blood or urine has a detectable amount of alcohol or any other substance or substances." *Id.* It also defines "other substance or substances" as including: "any drug, chemical or substance that has, or may have, the effect of impairing the mind or body, or otherwise affect the senses, responses, motor function, or alter a person's perception on duty." *Id.*

The Hearing Officer determined that the KDOC failed to prove by a preponderance of the evidence that Parrish violated this policy, because it did not offer evidence that cocaine is a drug that can impair the mind or the body or otherwise affect the senses. The Board rejected the Hearing Officer's finding, stating that it was "certainly aware that cocaine is an illicit substance and is contraband by its nature." The Board stated that, although the KDOC may not have introduced a learned treatise into evidence demonstrating that cocaine has the effects cited in CPP 3.11, it is not in dispute that cocaine is a drug that can be mind altering or otherwise affect the senses.

While the Hearing Officer was correct regarding her limited ability to take judicial notice of facts by relying on matters outside the agency's area of expertise, we do not believe that this was a case that required her to do so. The Hearing Officer is certainly permitted to rely on and cite to state law. She needed to look no further than Kentucky's Penal Code to find that our General Assembly has defined cocaine in such a way that it would clearly fall within the type of substances prohibited by the KDOC's policy. In the Commonwealth, cocaine is regulated as a Schedule II Controlled Substance. *See* KRS 218A.070(1)(d). Schedule II controlled substances are those that have a "high potential for abuse" and the abuse of which "may lead to *severe* psychic or phys-

ical dependence." KRS § 218A.060 (emphasis added). Given the manner in which our General Assembly has chosen to treat cocaine, it is beyond any reasonable dispute that cocaine is a substance which can, at the very least, affect one's "senses, responses, [or] motor function." Accordingly, we agree with the Board and the Franklin Circuit Court that the proof was sufficient to make a finding that Parrish violated the KDOC's policies when his urine sample collected during work hours tested positive for cocaine.

## IV. CONCLUSION

For the reasons set forth above, we find no error. The Order of the Franklin Circuit Court is affirmed.

ALL CONCUR.